Good afternoon, Council. Thank you for making yourselves available this afternoon. We are ready to proceed to hear oral argument in Curtis Fauber v. Ronald Davis, and when Council for the Appellant is ready to proceed, we'll be happy to hear from you. Good afternoon, Your Honors. I'm John Crapshule, and I represent the Appellant and Petitioner, Mr. Curtis Fauber. Your Honors, we would hope to reserve about five minutes, for rebuttal, and we'll keep that. Your Honors, I think it would be helpful, with the Court's permission, for me to give a very short sort of prologue, that I think helps tie together the two certified issues in this case, which is the vouching issue, which has the substantive violation component, as well as the ineffective assistance part of it, and what I would refer to as the plea offer as mitigation. In this case, with the killing of Mr. Urell, the DA was confronted with the case that, as it developed, he basically developed two suspects, Mr. Buckley and Mr. Fauber. Beyond that, there was very little in the way of physical evidence. There was no third-party eyewitnesses of the murder, so it really boiled down to those two individuals and who did what in Mr. Urell's apartment that night. So the DA, appropriately, he knew that to make the most solid case that he could, it would be very helpful for him to get one of these two individuals to cooperate. And he ultimately made plea offers to both, both to Mr. Buckley and to Mr. Fauber. Actually, to Mr. Fauber first. Each offer would be for that person to cooperate against the other suspect. Mr. Fauber declined. He said no. Mr. Buckley accepted. He said yes. And so given that and up to this point, we're not arguing that there's anything improper or probably a fairly common circumstance. But the DA at that point, he knew that he had to make Mr. Buckley's credibility as strong as possible. He needed to do whatever he could to shore it up. And he needed to make sure the jury stayed unaware of the fact that he had offered a plea offer to Mr. Fauber. Counselor, can I just interject? I don't want to cut off your setting of the table, but can I just ask a factual question? When the DA made the plea offer to your client first, is that the order? Yes, Your Honor. Did the DA at that point know who, what evidence suggested which of the two perpetrators might have been the one to strike the potentially fatal blow? He had already, there had already been interviews by that time of Mr. Buckley, who remained free. Mr. Buckley was not arrested. And there was also, um, there was an interview when Mr. Fauber was arrested, much of which was excluded because of the, an Edwards Miranda violation, um, in which Mr. Fauber made statements that indicated, and again, this didn't come in a trial, but the DA was aware of this information, um, that indicated that Mr. Buckley was sort of the primary actor in the commission of the crime. And that, um, that Mr. Fauber sort of joined in, but, but only afterwards. Um, so that was what the DA's sort of base of knowledge was at the time. Okay. Okay. Thank you. Um, is that, is that in the record in terms of the DA's base knowledge, or is that just a, in other words, it sounds reasonable, but is it a series of logical assumptions you're making, or do we actually know this? There is in the supplemental excerpt of record starting at about, not about it, at page 2,373, there is much of this in terms of the plea offer to Mr. Fauber was done orally in discussions between Fauber's counsel and the district attorney. Um, so what we're going by is a recounting of it, um, that is described at that supplemental lecture, the record 2,373 and the pages following that where the DA is describing sort of the history of the case and the offers that were made. Um, so the DA wanted to show at least credibility, obviously, uh, but he also wanted to make sure that the jury remained unaware that there was a similar offer in negotiations with Mr. Fauber. And in fact, the DA was the one who moved to exclude any evidence of the plea offer to Mr. Fauber. Um, and unless court wishes otherwise, I'd like to address the vouching issue first, which is the first in order in brief. Vouching has long been condemned as inappropriate by lawyers. It's inappropriate in a civil case. It's inappropriate in a criminal case. Uh, it's certainly definitely inappropriate for a prosecutor in a criminal case. And most importantly, it's inappropriate in a death to, to essentially vouch for your client or the strength of the evidence in the case. And preliminarily here in this case, the California Supreme Court essentially effectively said, yeah, this, this vouching was inappropriate. And if counsel had objected, it would have been excluded. It would have been excised from the plea agreement. It's not inappropriate to let the jury know that there was a plea agreement. In fact, defense counsel might in normal course of things, he's going to introduce that himself, but anything that suggests in any sort of official manner that the defendant, excuse me, that the witness is going to be testifying truthfully. And in here, even worse, that it's going to be monitored and enforced by the judge who was sitting right there in the courtroom. And, and the jury has spent a great deal of time with presumably has some trust in that that's, that's even more inappropriate. And can I, can I ask you to elaborate on your view that the reading of that portion of the plea agreement conveyed to the jury that the judge was monitoring the truthfulness of Mr. Buckley? It, it said that in the event of any disputes, clearly it said that if they, if essentially if the DA found it to be truthful, it was part of the deal with the district attorney that it be truthful. It said any disputes, this is what the plea agreement, the language of the plea agreement indicated, it said explicitly that if there's any dispute over the truthfulness of the testimony, that that would be decided by the judge presiding over the matter in which you testify, the judge trial. Right. But can I, let me, maybe I can just cut to the chase. I'm aware of what the terms of the agreement were. I guess what I was trying to get you to elaborate on is I wouldn't naturally view that provision as suggesting to the jury that the judge was monitoring Mr. Buckley's credibility in the sense that would typically be troubling, which is namely that the judge was making a contemporaneous assessment of whether, I think it was a he, right? Whether the judge believed Mr. Buckley and that if the judge had found Mr. Buckley not credible, the judge would have somehow interjected in real time, right? That would be trouble. And that's what I think our, that prior case of ours was getting at the suggestion that there's some kind of real time monitoring going on. And because you haven't heard from the trustworthy party to interject and say, Hey, this person's lying. You can sort of take added assurance that the person must be telling the truth. And I just didn't see this plea agreement provision as conveying that kind of monitoring. That's what I was wondering you could elaborate on why you view it as as bad as what occurred in the other case. Thank you, your honor. Yes. In this case, Mr. Buckley's testimony all took place. The important testimony, the testimony that told the whole narrative of what happened in Mr. Urel's apartment took place in one day. And he was cross-examined by defense counsel, disputing the truthfulness and so forth, but his testimony, the judge didn't intercede in real time. The jury was then basically told they were off for the next number of days, or at least portions of the next several days while the judge and the attorneys discussed legal matters. The jury, the case didn't go to the jury until a full week after Mr. Buckley's testimony. And what else is going to happen to test the truthfulness of his testimony? He's already given it in open court under oath. He's been subject to cross-examination by defense counsel thoroughly, well, you know, presumably thoroughly. And the jury hears nothing. A week goes by. They're given closing arguments in which the prosecutor reiterates the importance of this truthfulness provision and the judge's potential enforcement of it. And then they go to deliberate. They're not told if there was ever going to be any kind of judicial intervention, it would have occurred by that time. Why do you say that? That's what I don't get. Why do you say that? Why wouldn't it be after the, you know, the entire trial is over and after the other trial, in fact, there was some other trial, right? That Buckley was supposed to testify in. Why wouldn't the intervention by the judge, if it was going to occur at all, why wouldn't it be long after the jury had been If the judge had, in fact, been troubled and had doubts about the truthfulness of Mr. Buckley's testimony, it is difficult to imagine a scenario with that case where the jury would be allowed to convict and sentence someone to death without the judge intervening at some point. Or the jury could assume, even if the jury thought it was going to be later, the jury could believe it's being monitored, it's being taken care of, it's being guaranteed. There's like a warranty on this truthfulness. And so we don't have to worry about that quite so much. And it lowers the state's burden because they may well believe that it's taken care of by the system. Even if it's going to be taken care of later, we don't have to worry about that now. Because we understand that his truthfulness is going to be guaranteed. So either he's been found truthful, or maybe our verdict will be undone later if there's some later determination. Because really, Mr. Buckley's testimony was the key to the case. He was the only person who could talk about exactly what happened during the period of time they were in Mr. Urell's house. What about Mr. Rowan's testimony? He wasn't there in the room, but he does testify to some of what Mr. Faber told him. And that was that Mr. Faber thought he had killed Mr. Urell. And the state, I think, argues, well, you know, the Rowan testimony essentially supported the Buckley testimony and corroborated it. And that reduces the prejudice associated with what might have been improper vouching. Mr. Rowan was no stranger to the criminal justice system, and in fact, was using an alias at the time of these events. He made a lot of inconsistent statements to the police, leading up to his record shows that Mr. Faber was sort of a newcomer. He lived in New Mexico, was visiting Buckley at the time. Buckley and Rowan were neighbors. They planned this burglary together. Rowan had a stake in it. And here, Mr. Rowan, it was clear to Mr. Rowan who what the prosecution's theory at this time was, that it was Mr. Faber who committed the murder. So it was given Mr. Rowan's legal conundrum, his dilemma, and the fact that he saw where this case was going, it was very easy for him to decide not to implicate his next door neighbor and friend, Mr. Buckley, but just to say that it was Mr. Faber who did it. The state court doesn't agree with that in its decision and decides that it wouldn't be prejudicial. Assuming that an error happened, it wouldn't have prejudiced the outcome in terms of your client's outcome. And so for us to do something different in this case, don't we have to conclude that the state court's decision, just like no reasonable judge can come to that conclusion? And I guess I'm struggling with how is it that you meet that standard? Or do you disagree that that's the standard we apply? Well, here, this is a very confusing issue. Well, it's a difficult issue in terms of the state court applied. The state really didn't discuss prejudice. The state court said that, well, the- My recollection is the state court directly just talked about prejudice because it talked about the evidence that Judge Brest just referenced and said, even if this information about Buckley's plea hadn't been presented or yeah, hadn't been presented, that there was evidence in record to support Buckley's credibility that the jury could have come to the same decision, even without this information that your client thinks is improper. Well, the evidence that the state court, and we do believe there was discussion, and I was stumbling about this over whether this was decided under a Watson standard. And we're saying Chapman should have applied and therefore 2254-D doesn't apply. But even assuming that 2254-D applies, we argue that it was unreasonable to find no prejudice because really Buckley's corroboration and so-called corroboration, excuse me, Mr. Rowan's corroboration of Mr. Buckley was as to things that really didn't go to who the actual killer was. It was almost entirely about things that happened before the actual murder and the evening and days after the actual murder. Right, but those are- That really was not in dispute. Well, I'm not sure about that, but it means those other aspects of Rowan's testimony, which aligned with Buckley's, I thought the state's position essentially was that there was enough overlap that Rowan was supporting Buckley. Rowan had other independent information of what Falber had said. And so Rowan essentially helped boost Buckley's credibility before the jury so that the improper vouching shouldn't have made a difference to the result. The key in this case is not whether Mr. Falber was with Mr. Buckley at the time the murder occurred. In most of what Mr. Rowan discussed and testified to information he gave to the police was information that was sort of around the edges of the actual murder itself. The one thing that he did provide was a statement to allegedly with Mr. Falber indicating himself and actually applying force to Mr. Urel. It's our position that that really doesn't, given Mr. Rowan's credibility issues, the jury had plenty of room for doubting Mr. Rowan. In this case really did not, they couldn't have made the case based on Mr. Rowan obviously. To the extent he corroborated Mr. Buckley, it was, this jury started the case with a reasonable doubt. Mr. Rowan's so-called corroboration left lots of room for doubt. The case, the prosecutor in this closing guilt-faced statement is that this case hinges on whether or not you believe Mr. Buckley and any effort to shore up or to take away the prejudice of the vouching of Mr. Buckley, who had every reason to lie, to fabricate, by asking, having his next door neighbor say, oh yes, by the way, Mr. Falber said he's the one who struck Urel, that that's insufficient corroboration and it would be unreasonable for the California Supreme Court to have found that. Can I ask you some questions that are a little more procedural and that go to the standard of review. The vouching has produced two different types of claims. One is an ineffective assistance claim from defense counsel not objecting. The other is what's essentially due process claim from the prosecutor's comments. Looking for the ineffective assistance of counsel claim, I understood your brief to essentially acknowledge that EDPA does apply to that claim. Is that your argument or acknowledgement on that side of the house? Yes. Okay. It applies, the double deference that's always discussed under applying stricken claims under EDPA only applies to the first portion of it, whether it was air or not to object. And here, there's almost no, even the general's office doesn't argue that it was reasonable for counsel not to object. So there is a standard amount of 2254 deference as to the prejudice. Okay. So at least on the ineffective assistance of counsel, we agree EDPA would apply to that. On just the, on the due process argument, I understood you to be arguing EDPA does not apply to that because the California Supreme Court applied Watson and not Chapman. We did argue that in the briefs, your honor. Under Johnson versus Williams, the state has taken the position that, and this is the part I personally at least found confusing initially, is that because Watson is quote unquote more lenient standard to the accused, that if the state court applies that standard, then 2254 D applies. But here there was this problem I have with that. And I can't give you a case citation for this because I think it's sort of unique to this case is that the state court, the California Supreme Court viewed this purely as a state court evidentiary issue, a evidence code 352 issue, which is relevance versus undue confusion and waste of time. And so there is really no constitutional analysis to defer to. I don't know if that makes sense, but they really didn't address the constitutional issue. Okay. So I understand that and that sort of tracks what I think was said in the briefs. The issue though, on the due process side of the house that I want to move to or move over to is the procedural default, because even if EDPA doesn't apply to that because of the California Supreme Court's invocation of Watson, there's still a sort of threshold question of whether the claim was procedurally defaulted due to the failure to object, which essentially loops us back again to the ineffective assistance of counsel. And so can you comment on the procedural default issue and how you see its relation to the rest of your claims? As your honor indicated, counsel's ineffectiveness, his unreasonable failure to object would supply the cause and prejudice, we believe, to excuse that procedural default. The procedural bar here, we refer to it as the FETON, which is based on the lack of a contemporaneous objection. Here, that's the second half of the voucher claims that that was due to counsel's deficient performance. That, even under state law, could provide an exception or would surmount the bar. We've alleged that. That was alleged throughout state habeas. There was never a hearing on that. We alleged that in the federal case. And at one point, the judge had set the case for hearing on various issues, including where that would have come up and we could have shown that the bar was surmounted by that. But it all essentially the same issue now, because if it was procedurally defaulted, you need to show cause and prejudice, and the source of the cause and prejudice is the ineffective assistance of counsel. Doesn't it just come back to that fundamental question of was there an effective assistance of counsel? And you're right, the state hasn't argued that the performance is wrong, and so therefore, really, the action is all on the prejudice. Yes. Yes. For the substantive claim, the test is actually under the Brecht standard. For a strickland claim on habeas, it remains under strickland, albeit with the deferential layer on top. We'll be sure to give you time for a follow-up. Can you shift to the plea offer issue? Yeah. The plea offer issue is at this court in the Scott case in particular, and in Summerlin. Especially in Scott, the court, in a per curiam opinion, the court stated fairly directly that the giving of a plea offer is mitigating evidence. It's an indication of a point of view that this is not the most horrific type of crime, and that the defendant himself is not the worst of the worst. So it really is relevant to both the character of the defendant and the circumstances of the offense. Under clearly established law that existed at the time of Mr. Fowler's trial, the Supreme Court had spoken very clearly about the admissibility of mitigating evidence, and it's hard to find an area where the Supreme Court has spoken as expansively as they have on that issue. And the California Supreme Court, I think even referenced Lockett and Eddings, but then proceeded to view it again without really any prejudice analysis. They really viewed it as something that, well, for policy reasons, there may be other reasons for the offer, for a district attorney to decide to make such an offer. A jury has assumed DAs believe they're witnesses, and the jury was instructed they were sole deciders of credibility. In this case, though, it's our position that none of those, that's unreasonable. That logic is unreasonable. The fact that there may be other reasons for an offer doesn't change the fact that the offer was made. It's just basic law relevance that anything that you could infer towards a certain conclusion, even if there's alternative explanations of that sort of thing, doesn't make it irrelevant. The fact that juries assume that lawyers believe they're pay, it's very different to be... I'm sorry, that a plea offer was made. And they found undue confusion, and really they didn't reach, they decided it on state law grounds. Let me ask you this, and try to put it in terms of a pure issue of law. Is it your position that once an item of evidence is found to have some mitigating value, it clears the low threshold for relevance in the most general sense, that at that point, there can be no 352 analysis, in federal court, it'd be a 403 analysis, that in other words, is it your view that the Supreme Court has just said that as long as there's some minimal relevance in terms of a piece of evidence is mitigating value, that basically it doesn't matter how much time it might take up, because you have to give the state a chance to address it. It doesn't matter how confusing it might be, et cetera, et cetera, that the defendant has an absolute right to have evidence. No, and there are always cases, let's say, that this does not strip away the state court's judge's power to control the admission of that, administer the trial and control the admission of evidence, that some things may be so minimally relevant, and so unduly consuming of time or creating potential prejudice with the jurors, that it's not carte blanche, not everything comes in, but in this case, Your Honor, the Supreme Court has, U.S. Supreme Court, has made it quite clear that, for example, future dangerousness is a significant issue in any judgment by a jury in whether to impose the death penalty. In this case, the prosecutor kept out the fact that he was willing, he on behalf of the people of California, he on behalf of the local top law enforcement agency, was willing to let Mr. Fowler plead to a sentence where he would continue to be alive. He would be around other people. So that's it. That reflects his assessment of Mr. Fowler's future dangerousness. It must. Why do you say that, though? That possibly could be true, but plea agreements are given out for lots of different reasons. They are, and, but unless the jury is to assume that, to complete what I was saying before, and to your point, Your Honor, the DA having successfully excluded the fact that he had made a non-death sentence offer to Mr. Fowler, was able to tell the jury that you must condemn him to death, you must find him in favor of the death penalty, or else he's going to be a danger in the future. Who knows what could happen with the people he's around in prison, which, by the way, I was willing to let him do three months ago when I made the offer to him. And the other reasons for giving a plea offer could be weakness of the evidence. It could be preservation of resources. But unless we're willing to believe that that outweighs future dangerousness, like I said before, there are different inferences for why such a offer would be made. But the issue of future dangerousness and the judgment on that has to be paramount. I'm way over my limit, Your Honor. Okay. Well, as I said, we will certainly give you time for rebuttal. Do my colleagues have any further questions at this time? Okay. I'll hear from the state then. Thank you. Good afternoon, Your Honors, and may it please the court. Deputy Attorney General Jonathan Krauss on behalf of the state. So what I'd like to do is address the two or three certified issues that counsel did. I'm happy to answer any questions the court has. As to the interrelated vouching and IAC claims, as the court noted, these claims are procedurally barred. The underlying claim, I'm sorry, the voucher claim is procedurally barred due to counsel's failure to object. And because he failed to consider the merits of that claim. However, even on the merits, as Judge Bress noted, it ultimately doesn't really matter which of these two interrelate. Before you jump to the merits, I have one question about the procedural default that I'm struggling with. And that is, it seems clear to me in the record that the state court decided that the issue was procedurally defaulted. But the trouble is, it doesn't seem clear to me that the district court actually answered the subsequent federal question of, is there an prejudice analysis? Like the district court just kind of skipped over that question and went right to the merits. And basically I think it's saying, because there's no claim on the merits, I don't have to answer that procedural question. So if that's one, my questions are, one, do you agree that that's the state of the record? And two, what does that mean in terms of what we can do with procedural default? Your Honor, I would agree that that is more or less state of the record, but I think it's important to emphasize in response that Falber never, or counsel here, never presented an argument to excuse the procedural default. He had many, many years in the district court to present a claim or an argument that excuses the default. However, he failed to do so. So in that sense, I think the entire discussion and the argument that counsel might make even today is way for that reason. I think it's important to note though, that I understand that these courts are interrelated and when it comes down to it, the court will address the IAC claim, which does essentially deal with the same issue. So I understand that that's ultimately where this case is going, but I think it's important to note for the record that this was a procedural bar that was imposed by the state Supreme Court, and that is consistently applied in all courts. So what I would say though, about the merits of these claims, to understand that's where the court ultimately want to go on this, is that, as I was saying, it ultimately doesn't really matter which of these two claims the court elects to address first, because consideration of each claim will ultimately lead to the same conclusion, which is that the California Supreme Court reasonably found under AEDPA, that Falber could not demonstrate that the alleged improper vouching rendered his trial fundamentally unfair, or for the same reasons that he was prejudiced by the assistance of counsel. As to the state opinion, the California Supreme Court directly took on the issue of whether there was prejudice in this case, contrary to what counsel was arguing. And I also should note that contrary to counsel's argument that the state Supreme Court addressed this solely as a state law claim, the record belies that. If you look at the California Supreme Court's opinion, they recognized at the outset of their analysis of this claim, that Falber was presenting it as a federal constitutional vouching claim. And we know that because the California Supreme Court, in its opening paragraph of this claim, listed all of the constitutional provisions that be implicated by Falber's claim. But what's important to note here, and why this is a merits ruling, is the California Supreme Court expressly found that there was no prejudicial error here, even if there was vouching. And yes, it decided that claim on the Watson state law standard, but under Johnson v. Williams, the fact that they found that there was no prejudicial error under the lower state law standard necessarily means that they likewise found that there was no prejudicial due process. So for that reason, this claim is entitled to Ed Pedefra. What about the Ninth Circuit decision in Hall v. Haas, that you got some play in the briefs, it seemed like an analogous case where we had a Watson type analysis and said, that is a state law analysis, it's different than Chapman, and you can't apply Watson to a federal constitutional claim. How do you get around that precedent of ours? Well, what I would say, again, Your Honor, is that when the court was addressing the claim, it addressed it as a federal constitutional claim. Had the California Supreme Court only cited California state law, or presented it as an evidentiary admission of evidence type issue, something like that, and then addressed it on Watson, then perhaps that argument would have more merit. But given the fact that the California Supreme Court made it very clear that it understood this claim to be of potentially a federal constitutional nature, and then yet still found that there was not even enough prejudice to demonstrate prejudice under Watson, that necessarily means under Johnson that they necessarily found that there was no federal due process violation. And that's what I want to talk about, because the Supreme Court reasonably held here that the jury would have found Buckley's testimony credible based solely on the evidence that was deduced in trial, and not based on any extra judicial information like that contained in the plea agreement. Buckley was, of course, the key witness. I'm sorry, Your Honor. Buckley was, of course, the key witness to cases, no getting around that. But Buckley's testimony was corroborated in all important respects by the testimony of Melville Rowan. Both of these men were arrested independently of one another, one for a traffic violation and one for a parole violation in September of 1986. And from that point, they began to give statements about what happened to the murder of Uriel and how it has to do with Fauber. That, of course, happened long before Fauber was extended his plea offer. I'm sorry, Buckley was extended his plea offer long, of course, before Rowan was given immunity. Am I right in remembering, though, counsel, that the initial statement that Rowan gave was according to him that Fauber said was that we, meaning Fauber and Buckley together, had killed the victim, leaving it, of course, ambiguous as to which of the two, and that it was only later, I guess, perhaps as it became clear, you know, which of the two accounts would be more beneficial, maybe from his standpoint, as well as from Buckley's standpoint, that he then said, well, no, actually, what Fauber said is that he, you know, meaning Fauber, is the one who delivered the fatal blow. Am I remembering that right? I believe so, your honor. But I think ultimately the key issue is whether Fauber was himself implicated in this crime. And from the very outset, Fauber certainly was. And any suggestion that Buckley was trying to frame Fauber, put this on him, is belied by the record. I think, I mean, I guess I view this claim as really a more going to the penalty, not so much the guilt, because he was going to be convicted on a felony murder theory, even if he wasn't the one who had swung the axe, right? So it seems to me what makes Buckley's testimony and Rowland's supposed cooperation critical to the outcome of the trial is that it was, he placed the axe in Fauber's hand. And that's what I was getting at. And you say that, well, he provides this robust cooperation. It seems to me it was quite shaky because the initial statement he gave when, as you said, he might not have had a sense as to where the chips were going to fall. It was framed in terms of we, and then it only later did he shift to saying, well, actually Fauber said he had been the one who held the axe. Well, as your honor noted, first of all, it ultimately doesn't really matter who swung the final blow, as you said, Judge Wadford, that even if, and the prosecutor argued this to the jury, even if the jury somehow found that Buckley was the one who swung the final murder. So that, and of course your honor is acknowledging that. Well, not the social circumstance counsels. I understand that at the time the law required the perpetrator to have the intent to kill. And that's, that's why it was critical that Fauber had the axe, right? Right. And that is of course, why Rowland's testimony is so important. Rowland of course, not only testified consistent with Buckley and I know the court has acknowledged this already about the events leading up to and after the planning, the stakeout, and then all the events that happened after. But this is sort of perhaps the most important thing is that Buckley, of course, testified that Fauber swung the axe and that he struck Uriel in the back of the head with his axe. And Rowland of course, testified that later that night, Fauber confessed to him that he did exactly that, that he swung the axe with such force that he thought he had killed Uriel because Uriel was having so much difficulty breathing. So that testimony, Rowland's testimony is crucial, of course, to corroborating Buckley's testimony. And of course, given that this is not the case, what we're really looking at here is whether the state Supreme Court's rejection of this claim on the grounds that there is no due process violation, whether that is a reasonable one, whether it is possible for any juror, any juror at anywhere to agree with the court, the state Supreme Court's reasoning in this case. It should note as well that Buckley's testimony was also corroborated by Fauber's own incriminating statements, incriminating himself in the lead up to the crime. And Fauber, Buckley's testimony was also corroborated by other physical evidence that linked Fauber to the crime. Specifically, I'm referring to the Thomas guide map that was found in his possession as well as to the telephone charger. I think the reason what you're saying just doesn't really matter is that of course, there's not really a dispute that Fauber is going to end up being convicted of at least on a felony murder theory. So all of the evidence you're talking about just goes to that. What we're focused on is whether he should have received the death penalty. And as to that, all that matters is whether Buckley's telling the truth when he says that it was Fauber who struck the blows, not me. Right. And that's the issue that was put before the jury. And the prosecutor made very clear that as a jury, hearing all this evidence, they can really only believe that both men, both Buckley and Rowan were telling the truth, or could believe that both of them were lying. And that's again, because their testimonies are so consistent. So there was ample evidence before the jury where Buckley testified as well on Rowan's corroboration of the testimony for the jury find very reasonably and conclusively that Fauber was the one who won the act. There was evidence to that effect. As your honor knows, he didn't ultimately match for the guilt phase. There was enough evidence for the jury to determine that he was the main perpetrator in this case, given again, his own as well as Buckley's. So all of this evidence taken together provided ample corroboration for Buckley's testimony, again, such that the California Supreme Court could reasonably find that Buckley's testimony was credible to the jury. And that's, Fauber can't show with regard to this claim that there is no possibility that a fair minded jurist would agree with the state Supreme Court's rejection of both of these claims, the underlying claim and the ISC claim on due process grounds for the underlying claim and prejudice grounds for the related stricken claim. And that's what I meant. Did the Buckley plea agreement get mentioned at all in the penalty phase arguments by the prosecutor? Your honor, I'm not sure about that. I'm not sure if it was, but of course the prosecutor did mention this agreement to the jury at his closing argument and guilt phase. It was no secret that this is what happened, of course. And the important point for our purposes is that the jury had every reason to credit the testimony based on what they saw and not based on that evidence. And I think it's important to note as well that the jury was instructed that they were the ultimate arbiters of witness credibility. They were not as counsel suggests to simply outsource their credibility determination to the trial court or to the prosecutor. It was made very clear to them that this was their determination to make. And one more point I'd make about that is that the California Supreme Court found that this language in the plea agreement was irrelevant. And that irrelevance cuts two different ways. It was of and that's why it shouldn't have been included. But the fact that it was irrelevant means very likely as the Supreme Court found that the jury wouldn't have been swayed by it because a reasonable juror sitting in this case would understand or reason that prosecutor wouldn't put forth somebody's testimony if they didn't believe them. So in that sense, being told this information, although it shouldn't have come in, didn't likely sway the jury's evaluation of Buckley's credibility. Turning next to the other claim, this is the plea and its rejection as mitigating evidence. The Supreme Court has never held that a plea offer constitutes inherently mitigating evidence. The Supreme Court has of course found that all relevant evidence should or could be admitted as penalty phase, but a plea offer has never been held to be relevant mitigating evidence. And that is because a plea offer says nothing about the defendant's character and nothing about the circumstances of the crime. And in this case, the record is ultimately silent about why the prosecutor made that offer to Mr. Favre. And so that's the California Supreme Court couldn't have considered any such reasoning. And of course, as the Supreme Court noted in its opinion, the prosecutor could have extended that offer for numerous valid reasons that had nothing to do with any subjective... Sorry to just finish it from one side. I was just going to say that the prosecutor could have made this offer to Favre for reasons that had nothing to do with any subjective views he had about the death penalty and could have been simply because he wanted to conserve state resources or because he wanted to spare the victim's family a difficult trial. And because we don't know, the California Supreme Court's rejection of this claim is entirely reasonable because without an explanation... Yes. Okay. So one quick question and then one longer question. Do you agree with your opponent that at the time the DA made the plea offer to Favre that Buckley had already said that, hey, it wasn't me, it was him? Your Honor, I'm not sure the exact timeline of when exactly the offer was made. I do know that Buckley had long before the offer was made, again, given his statements that were implicating Favre in this crime. But Your Honor, I'm sorry, I don't know the exact timing of it. Okay. But it's fair to assume that when the DA extended the plea offer to Favre, he, I'm assuming it's a he, the DA had reason to believe that it was, in fact, Favre who had swung the ax. Is that a fair assumption? That's correct. Yeah. Okay. So then maybe you could respond to this specific argument that your opponent makes. Let's assume that you're right, that as a general matter, maybe it's true that plea offers themselves are not always admissible. But when the DA makes an affirmative argument as to future dangerousness, even in prison, that at that point, they most certainly become relevant in a mitigating sense. What's your response to that argument? Well, I would say that it's possible that a plea offer could become relevant. I'm not saying that it would never be relevant. All I'm saying is the Supreme Court has never held that they are inherently relevant just on their own, again, without an explanation. If there's an explanation given, perhaps, then that is something that could potentially make that relevant. I understand, and counsel cited the Summerlin and Smith cases that were Ninth Circuit cases in which this court has found in the past. I think they're both Arizona cases that a plea offer is relevant. I think it's important, though, very briefly to distinguish those cases, because those are not AEDPA cases. The Summerlin case occurred before AEDPA's pre-AEDPA case, and the Smith case dealt with an issue that was not rejected on the merits by the state court. So AEDPA simply didn't apply to that claim. And I think it's very safe to say, at the very least, that there is no controlling law. Even if there's perhaps an inter-circuit split about whether a plea offer is inherently relevant or mitigating, there's certainly no controlling law that would say that he's entitled to relief or that the state Supreme Court unreasonably rejects the claim on those grounds. And I'd also say- I guess I'm not sure I follow your argument, because I heard you say that you would concede that, at least in the circumstance where the prosecution is making a dangerous decision, that a prior plea offer to that very defendant, the prosecutor is now claiming the only appropriate punishment. Because that really is how I read the closing argument. The only appropriate punishment here is death, because if you don't kill him, he's likely to kill again in prison. That's what the prosecutor is saying. So in that scenario, I heard you say that, yes, well, if the prosecutor had made a prior life without parole plea offer, that might well be mitigating evidence. But as soon as you make that concession, I guess it seems to me that the U.S. Supreme Court's cases don't really allow for this kind of 352-403 balancing. They say pretty categorically that a defendant has a right to have the jury informed of relevant mitigating evidence. So most of what I read in the California Supreme Court's analysis was this well, it would be unduly prejudicial to take up too much time. And that just seems to me irreconcilable with the much more categorical line that the U.S. Supreme Court has drawn. What's your response to that? Well, my response first, and I should have said this earlier, I think it's important to note that this argument about future dangerousness is essentially waived. It should not be considered by the court. This is the first time that Falvers presented that argument, never presented it to state court, never presented it to the district court, despite many, many years of having an opportunity to do so. So that's number one. But again, we're not alleging categorically that a plea offer could never be relevant, only that it's simply not relevant in this case. And this California Supreme Court had nothing before it to provide explanation for it. I think the other point I'd make about that is that even if, and this takes me beyond the rejection, which we'll get back to in a second, even if this offer were admitted as relevant evidence, it wouldn't have made a difference at the penalty phase, because it's important to note that counsel put forth what was an incredibly thorough and comprehensive case in mitigation, one that involves calling some 35 witnesses, a social historian that interviewed some 60 people, testified at great length about Falvers' upbringing, about his marred by abuse, by neglect, by violence, by death in the family. I believe a brother died in a motorcycle accident. All that evidence was put forth by counsel, and that was very comprehensive and again, thorough evidence. It's difficult to understand, and Falvers simply cannot show, had this offer standing alone being introduced as mitigating evidence, that it would have made any difference. It would have moved the needle at the penalty phase when all of that other evidence failed to do so. And that's especially when considering that that evidence is outweighed by what was a very compelling and persuasive case in aggravation, one that talks not only about Falvers' responsibility for the Euromurder, the one we're talking about here, but also for the church and Dowdy murder and other assorted acts of violence. It demonstrated that he was a cold, conscienceless killer. The last one- I think you have to concede, counsel, that this is not, I mean, it's a little bit surprising that this got charged as a capital case. If you didn't have the other murders, and there obviously wasn't definitive proof as to one of them for sure, maybe there was stronger proof as to the second. But I guess you have to concede that the reason this becomes a potential capital case is precisely what the point you were just alluding to, is that the jury would have viewed Mr. Falvers, who as I understand it, really had no prior record of violence. It's just kind of a bizarre, you know, he's what, 24 years old when he goes on this, according to the state, this killing spree in a relatively short period of time. I think the case for why death is the appropriate punishment would have to be the argument that the DA made at trial, which is, listen, look at the pattern here. If you don't end this man's life, he's likely to kill again, albeit in prison. It might be a prison guard, it might be a fellow prisoner. But you don't, I mean, I guess I find it hard to accept that the jury wouldn't find it relevant that that same prosecutor who was making that pitch to them had himself apparently concluded that no, actually it was perfectly safe to have Mr. Falvers live out the rest of his life in prison because I actually extended a plea offer that would have allowed him to do that. Well, I think again, Your Honor, we don't know why exactly the offer was extended, even if the prosecutor argued at the closing that this was a guy who was incredibly dangerous and we don't know exactly why the offer was made. But counsel, just respond to my point. It doesn't matter why. The mere fact that he was willing to let Falvers live the rest of his life in prison, notwithstanding the obvious risk that he might, if the state is to be believed, kill someone in there, the DA found that risk acceptable. It does not matter what the particular reason was. Do you understand what I'm saying? I do understand that. I'm sorry, Your Honor, I do understand that. I think then to that, I would say again, that to the extent that an offer like that could be relevant, there's no Supreme Court law saying that what California Supreme Court did was improper or unreasonable. And the next point I'd make is that even if that's all true, even if that is relevant evidence that would, that the jury should have heard, Falvers still needs to demonstrate that there was actual prejudice from that. That there was a real danger that he or that he can show that he would have received a better result here had that information come forward. And I think when you consider all of the evidence that was presented in aggravation and all the evidence that was presented in mitigation, this was a very comprehensive case. Falvers simply cannot show that that one offer, even if I, you know, even if we can see that it was incredibly relevant to his case, for the reason that Your Honor said, it still, still did not make a difference in this case. And that's the point. Hadn't come in, what happens then? I mean, is there then further testimony? Does it open the door to testimony by Falvers as to why he rejected it? Or does it, does it then invite testimony by the state as to why in fact it was given and then why it was later when it was rejected, we decided to pursue the capital case? I mean, it becomes almost like a case within a case. And comment on just what will be the implication? What would be, what would happen practically if this were allowed in? Yeah, Your Honor is absolutely right. So this would have become a long drawn out process. And I think it's important to understand that, and this is something the California Supreme Court found as well, that if Falvers wanted to make his rejection of the offer relevant in any way, he would have had to testify. And of course, Falvers was unwilling to testify because he knew no doubt that that would open the door to extensive cross-examination, as Your Honor is noting, from the prosecution. And that's obviously why he didn't want to go that route. But because he didn't go that route, he lost his chance to do so. He lost his bite of the apple. And as the state Supreme Court reasonably found, given that he didn't testify, and however much time that would have taken, given that he didn't testify, there is simply no way that Falvers can demonstrate that the state Supreme Court's claim was unreasonable. Because the relevance of the rejection of the offer was dependent entirely on Falvers' explanation for it. And that explanation was never given. Therefore, it was, by its very nature, an irrelevant piece of evidence. It's a common situation, I think. I apologize, Judge Rochford, if I spoke up. Go ahead. It seems it probably is a common situation where someone's offering a plea and then doesn't take it, and then greater charges are then brought against them. And in the context of an offense like this, the greater charge, there's only one greater charge to bring than the one the defendant would have otherwise pleaded guilty to. Are there other examples of these kinds of plea agreements coming in, at least in California state court practice, that you know of? I am not aware of that, Your Honor. But I agree that this is a very common thing, that prosecutors will extend different offers, again, for all sorts of valid reasons that have to do with the implication by defense counsel here that it's just because the prosecutor didn't feel confident in his case. There's many, many valid reasons why an offer like that could be made, and that's why inherently it is not relevant. It could become so. But again, I think there's another important point, which is that there's a public policy interest here as well, that if prosecutors are afraid to extend offers like that for fear that it would essentially be used against their case at the penalty phase, there might be a reluctance on the part of prosecutors to ever extend those offers. And those offers could ultimately be beneficial to criminal defendants. So it doesn't make sense as a matter of policy to say that a prosecutor should feel inhibited in giving an offer, even if ultimately he ends up electing to try somebody like Fulber, in this case, for a more serious crime. Yeah, well, then you just don't argue future dangers. And you don't have that problem. Can I ask you about the, unless my colleagues have other questions on the fee offer issue, I'd like to move to the, no, okay. Can I ask you about the ineffective assistance claim in the mitigation phase as to the mental health experts? Put aside the additional family history and the like, but focusing on the new experts that came forward. I guess I wanted to hear your response, your further response in addition to what you said in the briefs as to that portion of the IAC claim. That specifically, I think what I would say generally, and then I'll speak to that specifically, is that the question for evaluating what counsel did and whether it satisfied constitutional standards for effective representation, the standard shouldn't be, can we look at some other thing that counsel might have done? The question really should be, or the analysis should be, what did counsel do? And was that representation? And that's why I included the Ochoa case in the 20HA letter, which illustrates exactly that point, that there's always something that a criminal defendant could say, well, I wish counsel had done this different thing. That's always going to happen. But in terms of evaluating effectiveness, the question is, what did counsel do? And I've already explained that counsel put on a very broad case. And when it comes to mental health specifically, counsel obtained an expert that determined the father did not suffer from any mental deficit. And he was more than entitled. I'm not sure that that's quite true. You say it in such categorical terms. I thought Dr. DeGlover, I can't remember the name, but the original expert who testified at trial, I thought he said essentially that according to the test that I was able to administer, I can't say that, I don't know that he has brain damage or whatever. There are other tests that I can conduct, but I'm not able to do that in a jail environment. And I thought he said that maybe 30% of the cases, the tests that I did administer wouldn't necessarily show, even if somebody did have these underlying conditions. And so I guess I thought that was at least some suggestion to counsel that, well, maybe there are additional tests that I need to press to have done, because that's what my own expert is telling me. I think it was any further testimony there would have led to significant rebuttal on behalf of the prosecution. They could have put forth, as we noted in our briefing, considerable hospital records that might've rebutted all those claims and would not have actually benefited father in any event. And so I think for that reason, counsel can't, especially in hindsight, be faulted for failing to put on additional evidence when what he did in this respect was so compelling. The last point I would say to all of that is that even if this court finds that counsel could have done more in some respect with regard to mental health or anything else, it's important, again, to recognize that this was, as presented, a very compelling case of mitigation. And yet it fell far short when it came to the state's extremely persuasive case in aggravation that showed, again, that Fowler was responsible for not just one, but at least three different murders, as well as terrorizing Jim Daddy, who was one of his victims' girlfriends or wives. So even if Fowler could show that this court finds state Supreme Court's rejection of this claim was unreasonable with regard to deficient performance, he still cannot demonstrate that he was prejudiced due to counsel's actions or failure to act in this case. But I guess let me just push back on that. I mean, you claim that the case of mitigation from the mental health expert was compelling, and it really wasn't. Most of Dr. Glover's testimony was probably more damaging and seems to me actually do present a compelling case in mitigation because they offer some explanation that's not attributable to the culpability of Mr. Fowler for why he went on this sudden and otherwise just kind of aberrational killing spree, right? They locate it in the family mental history of having mental issues, the abuse that he suffered as a child, the head trauma, and they, at least as I take their declarations, were willing to say that he did in fact suffer from brain damage, which our cases suggest is one of the most powerful pieces of mitigation evidence. An expert can say that this person's, you know, the crimes they committed might be attributable to some kind of brain deficiency that they're not responsible for, having to do with trauma that they experienced as a kid or an accident and the like. Anyway, that's what I read the new experts are saying. Dr. Glover gives us nothing whatsoever. Well, to that point, I would say, as sort of a procedural point, that at the state court level, when counsel put forth, when Fowler put forth all of these exhibits, he did so in sort of a very generic, general way. I didn't cite anything specific. So the California Supreme Court cannot be faulted in that sense for refusing to sift through all of these records to make a determination about whether there was validity to any of that. So that was not, while it was before the state court, it was not presented to the state court in any way that we could fault or that one could fault the California Supreme Court for rejecting that claim. And again, beyond that point, even if this court finds that the it, I would, again, reiterate that the evidence that was presented was a very thorough case in a lot of respects, maybe not in the way that your honor is highlighting, but in all other respects. And yet that still fell far short, given, again, as your honor, what your honor characterizes as a killing spree in this case, that was the evidence that moved the jury. And it's difficult to demonstrate that anything else would have done what the case and mitigation that was presented failed to do. Okay. Very good. Do my colleagues have any further questions for the state? No. Okay. Let's put three minutes on the clock for rebuttal, please. Okay. Please proceed. Thank you, your honor. And I will keep it brief. I, first of all, the court has indicated, your honor indicated, Judge Watford, that with respect to the vouching issue, and that it was really only relevant to the penalty phase. And by the way, it was repeated in the penalty argument. And I would maybe take issue with the relevance of the guilt phase because Mr. Fauber, this was during the Carlos Anderson window. The prosecutor knew he had to show that Mr. Fauber murder, he'd have to show that Mr. Fauber intended to kill. The only way he did that was through the voucher for testimony, Mr. Buckley. And so Mr. Fauber, in my opinion, the vouching is very relevant to the guilt phase of the trial. Okay. Just to jump in on that, and I'll make sure you have enough time to cover your other points. The reason I was saying that before is that I thought that the theory for first-degree murder could have just been a straight felony murder, that this was a murder committed in the course of a robbery and or a burglary. And if the jury believed, as I think it most definitely would have, that your client was involved in that robbery and burglary and was an integral participant in the house and the like, if his co-defendant is the one who killed the individual in the course of the robbery or burglary, I thought under a felony murder theory that he would be convicted of first-degree murder anyway. Am I wrong about that? Hey, all right. My understanding of the Carlos Anderson period of time is that there was a significant narrowing in the felony murder rule where there was a requirement of the showing of intent, not just being present with another felon who commits a murder. And that incidentally, after Proposition 47 is the current law in California. So without belaboring it, I think it's still relevant to both phases of the trial. With respect to the plea offer issue, and I will end with this, and this is in our brief, the Supreme Court in Skipper said as follows, where the prosecution specifically relies on future dangerousness, not only does Lockett and Eddings require an opportunity to rebut, it is also the elemental due process requirement that a defendant not be sentenced to death on the basis of information which he had no opportunity to deny or explain. That's a direct quote from the Skipper case, and part of that is a quote from Gardner versus Florida, a case that preceded Skipper. That's what happened here. And the Supreme Court and the Ninth Circuit has consistently recognized the outsized role that future dangerousness plays. The Supreme Court in the Jurick case, which we also cited, said that that determination must be made in any death penalty consideration. Because he had the opportunity to rebut that through lots of different arguments and through lots of different witnesses, he was disallowed from presenting the plea agreement. That was one, you argue, is one piece of it, but it's not like he was blocked altogether from rebutting the future dangerousness argument. He in fact tried mightily to do that. But the difference in this case, Your Honor, is that the same representative of the state who offered Mr. Faubourg the opportunity to live out the rest of his life, albeit in custody, moved to exclude, before the defense counsel even proffered the plea agreement, or the plea offer, as mitigation. The prosecutor moved to exclude it successfully, and then argued to the jury that the only appropriate sentence in this case was a death sentence, in large part because of the future danger Mr. Faubourg would pose to guards, to cellmates, to prison staff. And I submit that that carries a tremendous amount of weight with the jury. And this was a jury that, this was not a first vote verdict. The jury sent out a note asking what would happen if they weren't able to reach a verdict. Would it be retried or did it default to life without parole? So that's an indicator that this was not a plan done for the jury. Counsel, I mean, just to follow up on that point, I get the argument, and it is somewhat compelling, I think, as Judge Watford has outlined. But my review of the record is that Mr. Faubourg's trial counsel never tried to get in the rejected plea agreement for that reason. The reason that Faubourg was arguing for getting this evidence in at the penalty phase was entirely different. So why doesn't that matter? I mean, the trial court's ruling on the arguments that are being made, in all the levels of review, that's what's being looked at. And yet now we're being asked to look at this for a totally different purpose, which arguably is a better purpose, but it wasn't made before. So why doesn't that matter here? I don't have the page number in our briefs, Your Honor, and I apologize, but the defense counsel made arguments not just based on Mr. Faubourg's rejection of it, but also the relevance of the offer itself, which I think naturally includes this issue. So why wouldn't the relevance determination be based on what Faubourg said he wanted to use it for? Because Faubourg says, I want my rejected plea agreement in to show that I'm loyal and that I have good character. And a trial court could easily look at that argument and say, not relevant for that purpose. That's true. And frankly, there was undue emphasis on this whole idea of the relevance of his rejection of the offer. But all I wanted to say, Your Honor, is that the defense counsel did argue separately that the making of the offer itself, irrespective of Faubourg's accepting or rejecting it, was relevant evidence. It reflected on the government's point of view of his character and the circumstances at the time. And part of that, you know, I think it's almost like character evidence. It's like it's too relevant to allow the jury to hear that this prosecutor, whose irony and future dangerousness was willing a few months ago to let him live. I mean, that's really, it's hard for me to comprehend how that is not relevant. Okay. Thank you very much to both of you for your arguments today. The case just argued and we are adjourned for this session. Thank you, Your Honor. Thank you, Your Honor.
judges: WATFORD, BRESS, FORREST